BAILEY *v.* STATE.

4553 219 S. W. 2d 424

Opinion delivered April 11, 1949.

*Ross Robley* and *Elmer Schoggen,* for appellant.

*Ike Murry,* Attorney General and *Arnold Adams,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. The verdict was: "We, the jury, find . . . John Bailey guilty of rape . . . and assess his punishment at life imprisonment in the penitentiary."

From a judgment responsive to the verdict the defendant's appeal seeks reversal on four grounds: (1) The jury was misled by the Court's reply to questions propounded regarding the right to recommend clemency. (2) A failure to instruct on lower degrees of crime, the only affirmative evidence showing rape, was prejudicial. (3) A preliminary hearing was denied, hence the information should have been quashed. (4) Systematic exclusion of women from jury panels was a denial of due process.

The facts present a sordid picture. Appellant, a married man with one child in esse and another expectant, went with Lee Doyle to a place where beer was sold. Doyle told Bailey he had a "date" with a girl whom he named. Doyle, presumptively at Bailey's request, telephoned his girl friend and asked that she procure a companion for Bailey. As a result of such overtures, Bailey's companion was virtually held prisoner for the night and repeatedly raped.

After patronizing places of incidental amusement the four, in Bailey's car, drove to Boyle Park. During a short stop Doyle and his companion got out and walked to the rear. While they were talking and smoking cigarettes Bailey suddenly drove away, and was not seen again by Doyle that night.

The prosecuting witness, 20 years of age, employed by a Little Rock real estate firm, testified that it was after eleven o'clock when the Boyle Park stop was made, on a dirt or gravel road. Shortly after Doyle and his companion got out of the car, Bailey became aggressive, but discontinued the struggle when it seemed likely the encounter might attract attention. Testimony on this

phase of the assault was: "I screamed and screamed so much that he got up and said, 'I'm sorry: I didn't know you were a nice girl. Come on and we will find the other couple.'" With this comment Bailey drove off, but the prosecuting witness did not know where they went. There were no houses in sight, no lights, or people. The witness then said:

"He stopped and didn't waste any time. He dragged me out of the car, threw me on the ground [on a blanket] and attacked me."

It is not necessary to repeat the details, which established completed rape. The witness said she kept screaming, and that a car approached; whereupon Bailey jumped up and said, 'Come on, let's get back in the car.' Instead of complying with the request, the unfortunate girl ran to the other car and begged for protection. The occupants proved to be Willie Ford and (Miss) Billy Garrin, who explained while testifying that in driving within Boyle Park they came to a dead-end road. In making a "U" turn a girl was heard calling for help. Ford was a paroled convict who worked for a bottling company. When the girl with Bailey begged to be taken to North Little Rock, Ford declined through fear that his parole would be revoked. The prosecuting witness got in Ford's car and talked with Ford's companion, revealing part of the sordid story. Ford, however, persisted in his refusal to give aid. The prosecuting witness, who in the meantime had been taken by Bailey to his own car, begged the couple to follow them to town, and this they promised to do. En route Bailey drove so rapidly that contact was lost. Ford's companion stopped and telephoned officers, and Ford later made a report.

The prosecuting witness, in explaining Ford's refusal to assist, testified that Bailey "dragged her" from the rear seat of Ford's car and forcibly returned her to his own conveyance. Ford told her he had taken Bailey's license number, that he would follow them, and if anything happened he would telephone the Sheriff:— "Then he drove awfully fast an awfully long way to

where he stopped again, and pulled off the highway onto a dirt road in the woods. Before he had completely stopped I jumped out of the car and ran a distance equal to half a block before he caught me and dragged me back." The transaction at that time was attempt to rape, but ". . . he kept cursing me in the filthiest language he could [think of]." Other attempts were made.

In these circumstances, characterized by intermittent attempts and specific acts of penetration, the night was spent. At various times Bailey appeared to be sleeping, but when the prosecuting witness attempted to escape he would grab her. Shortly after daylight Bailey drove the girl home. She immediately reported to her mother and sister.

Physical examination by a physician whose qualifications were not questioned revealed bruises and scratches on the body of the prosecuting witness, whose sex organs were bleeding. The hymen was lacerated, indicating virginity just prior to the transaction charged in the information. The Doctor testified that "from all the information I could obtain, the female organs had been entered."

The essential facts have been set out because of the contention that the jury should have been charged on attempted rape. The defendant did not testify.

*First—Was the Jury Misled as to Clemency Rights?* —After deliberating for approximately fifteen minutes, the jury re-entered the court room and the foreman said: "We would like to know if we can recommend clemency in this and leave it up to the Court?" Judge Fulk replied: "It is the law that the jury may recommend clemency, but it is not the law that the Court has to grant it." The Foreman then said: "We wondered whether we might recommend it." Judge Fulk answered: "You have the power to make that recommendation, . . . but it is not binding on the Court, and I don't know how the Court would take it." Then the Foreman remarked, "All right, we understand."

Counsel for appellant argues that the jurors were "unquestionably" led to believe that they might hope for clemency, even with a finding of guilt. But the jury could have exercised its own discretion to make the recommendation it thought proper. It is just as logical to believe that the Court's answer did not carry an inference of possible lenience, hence the fact-finders avoided the death risk and assessed life imprisonment. This is mere speculation, devoid of factual support, as is appellant's theory that the jury was misinformed. The Court correctly stated the law. A defendant cannot predicate error upon the want of it.

*Second—Failure to Instruct on "Attempt" and Assault.*—In defining rape the jury was told that "There must be a penetration of the body; there must be force; and it must have been against the will of the female." To this instruction the Court added: "The burden of proof is upon the State to show these things to your satisfaction beyond a reasonable doubt, otherwise you would have to discharge the defendant."

Appellant insists he was entitled to his Requested Instructions 13 and 14, shown in the margin.[1] Con-

---

[1] Requested Instruction No. 13: ". . . Under the information in this case you may find the defendant guilty of rape or you may find the defendant guilty of any of the offenses of assault which are included in the information. If you find the defendant guilty of assault with intent to commit rape, you may fix his punishment at any time not less than three nor more than twenty-one years. On the ather hand, if you have a reasonable doubt of whether it is rape or assault with intent to commit rape, you will find the defendant guilty of the lesser offense. If you do not find beyond a reasonable doubt that the defendant was guilty of either rape or assault with intent to commit a rape, [but] if you further find that the defendant committed an assault and battery on the prosecuting witness, it would be possible, under this information, if you found the evidence to justify it, to find the defendant guilty of assault and battery, which is the unlawful striking or beating of another person with the intent to inflict an injury, and fix his punishment at a fine not to exceed $200."

Requested Instruction No. 14 would have told the jury that if it found the defendant guilty of assault and battery under the evidence, "but are not convinced beyond a reasonable doubt that he is guilty of assault to rape, it will be your duty to return a verdict for the lesser offense. Further, if you find that the evidence under the instructions of the court justify you in returning a verdict of guilty of assault to rape, as defined in these instructions, and have a reasonable doubt as to his guilt as to the charge of rape, as contained in the information, it will be your duty to give him the benefit of that doubt and return a verdict only for the lesser offense."

versely, appellee relies in part upon *Whittaker* v. *State,* 171 Ark. 762, 286 S. W. 937, where it was held that the defendant could not complain of an instruction that he should be convicted of rape or acquitted; the defendant having requested an instruction to the same effect; nor, says the opinion, was it error to give the instruction complained of when testimony by the prosecutrix tended to prove that the accused was guilty of rape, and the defendant's testimony was to the effect that he was innocent of any crime.

In the case at bar there was testimony of conduct constituting rape, and *in addition* there were repeated attempts. An assault with intent to commit rape is included in the charge of rape. *Pratt* v. *State,* 51 Ark. 167, 10 S. W. 233. Chief Justice COCKRILL's language in the Pratt case was quoted in a more recent opinion rejecting the appellant's argument that he suffered prejudice because when tried for rape and convicted of an attempt, the jury was instructed on the lesser degree. It was the defendant's contention on appeal that he should have been convicted of rape, or acquitted.

Our statute defines rape as the carnal knowledge of a female, forcibly and against her will. Pope's Digest, § 3403, Ark. Stats. (1947), § 41-3401. Other statutes define accessory to rape, administration of potion to a female, carnal abuse, abduction, seduction, and specific sex crimes. All are collected in a chapter of the Digests.

It was said by Chief Justice WALKER in *Cameron* v. *State,* 13 Ark. 712, that upon an indictment for a felony the accused may be convicted of a misdemeanor "where both offenses belong to the same generic class, where the commission of the higher may involve the commission of the lower offense and the indictment for the higher offense contains all the substantive allegations necessary to let in proof of the misdemeanor," although at common law the rule was different.

Assuming, without deciding, that conviction for assault and battery can be upheld where the indictment or information charges rape, (the transactions not being generically related) still, the broad range of proof

brought into play and the possibility of capricious conduct by fact-finders in reducing a serious charge to something relatively unimportant—these considerations require that Courts carefully scrutinize instructions that might be seized upon by either side to emphasize inferences that at most are vague. Hence we have the rule that one who objects to an instruction not inherently wrong cannot complain of prejudice unless the particular vice is pointed to or a correct instruction is offered.

Here the defendant's Requested Instruction No. 13 would have authorized a conviction for assault and battery, ". . . which is the unlawful striking or beating of another person with the intent to inflict an injury, and fixing his punishment at not to exceed $200."

The statutory definition of assault and battery does not contain the word "intent." Pope's Digest, § 2978, Ark. Stats. (1947), § 41-603. It is the unlawful "striking or beating of the person of another" that the statute denounces, and the intent to inflict injury is judicial construction. But a proviso supplied by Act of Jan. 6, 1857, p. 48, says that the section shall not apply to assault and batteries of an aggravated character "in which the fine under existing laws could not be as low as ten dollars." Pope's Digest omits the reference to "fines as low as ten dollars," and reads, "Provided, this section shall not be construed to apply to assaults and batteries of an aggravated character." Other statutes, such as § 2960 of Pope's Digest, dealing with assault with a deadly weapon, use the expression, "with the intent to inflict upon the person of another a bodily injury." See *Watkins* v. *State,* 179 Ark. 776, 18 S. W. 2d 343.

Mr. Justice Wood, dealing with assault and battery in *Moreland* v. *State,* 125 Ark. 24, 188 S. W. 1, L. R. A., 1917A, 140, wrote the Court's opinion sustaining the conviction of the appellant, a family physician who kissed a married woman without her consent. He quoted with approval from Clark's Criminal Law, that "The least or slightest wrongful and unlawful touching of the person of another is an assault"; and, while an intent to do vio-

lence is an essential element, the degree is immaterial. The violence frowned on by the cases where assault is involved is, as Judge Wood pointed out, "the slightest unlawful touching of the person of another." The intent to inflict a traumatic injury is not an ingredient. The mere "laying on of hands" is sufficient.

Our view is that in the circumstances of this case, where all the testimony tended to show rape and attempted rape, and where the use of physical force was a means of accomplishing sexual desires, the Court was not required to instruct that the crime of assault and battery could not be established unless the "intent to inflict an injury" were shown; nor was the statement that a fine of but $200 could be assessed a correct declaration of the law without adding the proviso relating to assaults of an aggravated character. Requested Instruction No. 14 was so closely tied in with No. 13 that rejection of No. 13—which alone contained the definition—rendered No. 14 unacceptable.

*Third—Preliminary Hearing.*—The defendant's preliminary hearing, set for August 11, was continued until August 13, arrest having been made without a warrant. On August 12th counsel for Bailey filed with the Clerk of the Circuit Court his motion to quash the information, alleging a denial of due process through failure to provide a preliminary hearing. We have repeatedly held that a defendant is in lawful custody when an information has been properly filed with detention under it. The writ of *habeas corpus* is at all times available to one illegally held.

*Fourth—Systematic Exclusion of Women From Jury Panels.*—It was stipulated that in respect of the First Division of Pulaski Circuit Court, no woman had been selected by the Commissioners since 1925.

By Amendment No. 8 to the Constitution of Arkansas qualifications of electors were fixed and equal suffrage conferred, but "women shall not be compelled to serve on juries." See Act 402 of 1921; Pope's Digest, §§ 8302-3-4; Ark. Stats. (1947), § 39-112, 113, 114. The Constitutional proviso and statute sections have been

construed as a privilege women may claim—declarations of public policy pursuant to which it has not been thought that jury commissioners abused their discretion when there was failure to include women on the lists of those summoned.

Criminal court trials often involve testimony of the foulest kind, and they sometimes require consideration of indecent conduct, the use of filthy and loathsome words, references to intimate sex relationships, and other elements that would prove humiliating, embarrassing and degrading to a lady.

Under recognized requirements in this State, racial distinctions are disregarded in jury service. More often than not the fact-finders are not permitted to separate after a case has been submitted. Standards of deportment between men and women, and individual conceptions of personal propriety enter into the transactions; and while of course the State possesses power and could through an all-inclusive constitutional mandate say that in jury service there shall be no distinction between sexes, and while the *right* of Commissioners to call women unquestionably exists, it has not been thought that the policy constitutionally declared in 1920[2] was of a character depriving Commissioners of the discretion exercised in cases such as that with which we are dealing.

It is suggested that decisions of the Supreme Court of the United States are conclusive of the issue and bound the trial Court to quash the panel. *Ballard et al.* v. *United States,* 329 U. S. 187, 67 S. Ct. 261, 91 L. Ed. 181. Effect of that case is to say that due process failed when the defendant (a female) was tried by a California jury of men, a showing having been made that women had been systematically excluded from jury service. The decision did not rest upon mere difference of sex. The Ballard case, however, was in Federal Court, and it is noteworthy that California's constitution does not carry a savings clause in favor of women.

---

[2] Amendment No. 8, although adopted in 1920, was not so recognized until the decision in *Brickhouse* v. *Hill* was handed down, 167 Ark. 513, 268 S. W. 865, followed by the ruling in *Combs* v. *Gray,* 170 Ark. 956, 281 S. W. 918, decided April 12, 1926.

In exercising its supervisory power over the administration of justice in the Federal Courts, the U. S. Supreme Court has said that " . . . the purposeful and systematic exclusion of women" by those charged with the duty of calling jurors for the Federal District Courts in states where jury duty is imposed alike upon the two sexes, relieves the defendant of the burden of proving prejudice in a particular case; but this rule has not been extended to state court trials—and certainly there are no expressions indicating that the discretion permitted commissioners under a State constitution such as ours would be controlled without a showing of conduct resulting in prejudice. See *State* v. *Taylor,* 356 Mo. 1216, 205 S. W. 2d 734.

In *Fay* v. *New York,* 332 U. S. 261, 91 L. Ed. 2043, 67 S. Ct. 1613, a state prosecution was brought to the U. S. Supreme Court by *certiorari.* The opinion was written by Mr. Justice JACKSON, who said that proof that only those women who volunteered or were suggested as willing to serve were subpoenaed for examination for service "was insufficient to show that women were intentionally and deliberately excluded, bearing in mind that New York gives women the privilege to serve, but does not impose a duty". A significant statement by Mr. Justice JACKSON is:

"While this case does not involve any question as to the exclusion of Negroes or any other race, the defendants rely largely upon a series of decisions in which this Court has set aside State Court convictions of Negroes because Negroes were purposefully and completely excluded from the jury. However, because of the long history of unhappy relations between the two races, Congress has put these cases in a class by themselves. The Fourteenth Amendment, in addition to due process and equal protection clauses, declares that 'The Congress shall have power to enforce, by appropriate legislation, the provisions of this article'. So empowered, the Congress on March 1, 1875, enacted that 'no citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States,

or of any State on account of race, color, or previous condition of servitude'; and made it a crime for any officer to exclude any citizen on those grounds. 18 Stat. 336-37, 8 U. S. C. Sec. 44. For us the majestic generalities of the Fourteenth Amendment are reduced to a concrete statutory command when cases involve race or color which is wanting in every other case of alleged discrimination. . . . It is significant that this Court never has interfered with the composition of State Court juries except in cases where the guidance of Congress was applicable, . . . [hence] one who would have the judiciary intervene on ground not covered by statute must comply with the exacting requirements of proving clearly that in his own case the procedure has gone so far afield that its results are a denial of equal protection or due process''.

We think the inference deducible from the Fay case is that where a State does not impose upon women as a class the inescapable duty of jury service, a defendant who complains that due process was denied, or that he was not afforded the equal protection contemplated by the Fourteenth Amendment, must show something more than continuing failure of jury commissioners to call women for services in a division of the Court where the innate refinement peculiar to women would be assailed with verbal expressions, gestures, conversations and demonstrations from which most would recoil.

Attention is called to the fact that the stipulation upon which appellant relies does not say that women have been systematically excluded from jury service. The court, seeking to express what it thought was intended, remarked that ''The stipulation relates to defendant's motion to quash the panel because the jury commissioners have habitually excluded women from jury service solely because they are women''.

The motion did not allege they had been *''systematically''* excluded. Our decision, however, does not rest upon this technical refinement; but rather upon the substantial ground that the record does not show that

the defendant failed to receive a fair trial at the hands of a competent jury.

Affirmed.