**Lonnie MITCHELL, Petitioner,**

v.

**Dan D. STEPHENS, Superintendent of Arkansas State Penitentiary, Respondent.**

**No. PB 62 C 24.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Aug. 6, 1964.

**498**

Christopher C. Mercer, Little Rock, Ark., for petitioner.

Jack L. Lessenberry, Little Rock, Ark., for respondent.

YOUNG, District Judge.

Petitioner, a Negro male, age 27, brings this habeas corpus proceeding, in forma pauperis, alleging the unconstitutionality of his conviction for rape in the Circuit Court of Union County, Arkansas, on April 11, 1959. Petitioner was sentenced to death and his conviction was affirmed by the Arkansas Supreme Court in Mitchell v. State, 230 Ark. 894, 327 S.W.2d 384 (1959). No application for certiorari was made to the United States Supreme Court. Petitioner's motion to vacate the state court judgment was denied. Mitchell v. State, 232 Ark. 371, 337 S.W.2d 663 (1960), as was also a petition for habeas corpus, Mitchell v. State, 233 Ark. 578, 346 S.W.2d 201 (1961), as well as a writ of coram nobis, Mitchell v. State, 234 Ark. 762, 354 S.W.2d 557

(1962). Petitioner then sought habeas corpus in this Court which was denied, Mitchell v. Henslee, 208 F.Supp. 533 (E. D.Ark.1962), rev'd per curiam 332 F.2d 16 (8th Cir. 1964). Pursuant to the mandate of the Court of Appeals, hearings on the petition were held on June 18, 1964, and July 2, 1964, in order that petitioner could present evidence in support of the contentions now urged.

At the state court trial, petitioner was represented by Mr. J. S. Thomas of El Dorado, Arkansas, a court appointed attorney who prosecuted the original appeal to the Arkansas Supreme Court. Present counsel has assisted petitioner in all subsequent actions, including this suit. The circumstances of the crime and a discussion of the evidence are set out in the several reported cases. The only issue presented by the instant case is whether petitioner's federal constitutional rights, in the particulars relied upon, were preserved in the state court action.

Petitioner alleges the following violations of his constitutional rights: (1) The conviction was based upon a confession illegally obtained; (2) Petitioner was insane at the time of the commission of the offense; (3) Petitioner did not have effective assistance of legal counsel at the state court trial; (4) Racial discrimination was practiced in the selection of the jury panel at petitioner's state court trial in that Negroes were systematically limited and excluded from jury service; and (5) There has been an unequal application of the Arkansas rape statute, Ark. Stat. § 41–3403 (1947), in that it is the "practice, policy and custom of sentencing Negro men to death for rape upon white women, while not inflicting this punishment upon any other persons." In this opinion, the Court will deal with these issues in the order mentioned.

#### I. CONFESSION

The robbery and rape of Mrs. O. G. Murphy, a 77 year old crippled white woman, occurred in the early hours of March 10, 1959, sometime prior to two o'clock that morning. Shortly thereafter,

police officers apprehended petitioner and took him to the police station, where he was booked at 3:10 a. m. and held in the City Jail until later that morning, when he was turned over to Sheriff O. E. Bishop at 9:30 a. m. Sheriff Bishop placed petitioner in the County Jail. Petitioner was arraigned for the crime of robbery on the morning of March 11th, at which time Mr. Thomas, an El Dorado attorney, was appointed as counsel for petitioner.[1]

Immediately following the arraignment on the 11th, Sheriff Bishop and the jailer questioned petitioner for five or six minutes in the lobby of the County Jail. At this time, petitioner related his activities on the night of March 9th, and stated that he had cut a screen at Mrs. Murphy's house with his knife, entered her home, got her purse containing $130.00 in cash, went upstairs, got excited, ran out of the house to the nearby school grounds, transferred the money from the purse to his billfold and then threw the purse away. Sheriff Bishop had known petitioner since boyhood, and the Sheriff testified that prior to getting this story he had advised petitioner that he did not have to say anything, and if he did, it could be used against him. Petitioner then made this statement confessing to the robbery in the prosecuting attorney's office, where it was recorded.

Up until the morning of March 12th, petitioner had claimed that he had discarded Mrs. Murphy's purse on the school grounds, but police officers had been unable to find it. On the morning of the 12th, Sheriff Bishop sent Sgt. Henley to ask petitioner exactly where he had put the purse. Petitioner stated that he had thrown the purse on the roof of the school building, and further, he told Sgt. Henley that he wished to make a second statement. (The police later returned to the

school grounds and found the purse on the roof of the building.) It was at this time that Sheriff Bishop had one of his deputies telephone petitioner's parents. Sheriff Bishop informed the Prosecuting Attorney, Mr. William I. Prewett, that petitioner desired to make another statement, and arrangements were immediately made for the statement to be taken in the office of the Prosecuting Attorney. This statement was taken by Mr. Prewett and Mr. Mayfield, Deputy Prosecuting Attorney, in the presence of Sheriff Bishop. At the time, petitioner's parents were in the outer office.

(a) *Petitioner's Waiver of the Right to Attack the Confession as Involuntary and Coerced*

Petitioner now, for the first time in numerous post-conviction attacks, denies that he made any statement to Sheriff Bishop about the robbery, and further says that he was forced into making the confession given in Prewett's office which was later used against him at his trial. Petitioner testified at the hearing on this petition that Prewett and Sheriff Bishop told him what to say, threatened him and physically abused him. On the contrary, Thomas, petitioner's court appointed counsel, testified under oath that petitioner prior to the trial told him that he had been well treated at the County Jail, and further that he had reviewed the confession with petitioner "word for word" and petitioner stated that it was correct.[2] Thomas further testified that he explained to petitioner that if he could "hook-up" any mistreatment with the confession, it would not be admissible at the trial.

During petitioner's trial in state court, and prior to the introduction of the confession into evidence, the court retired into chambers with counsel for both sides, as well as petitioner, in order to discuss

---

1. In Arkansas, assignment of counsel in felony cases is provided by statute. See Ark.Stat.Ann. § 43–1203 (1947), discussed in 4 Ark.L.Rev. 177 (1950). See also Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

2. At the hearing in this case, petitioner waived the attorney-client privilege as to any testimony disclosing communications between him and his lawyer, Thomas. Both counsel agreed that such testimony was proper, and it was heard without objection.

the admissibility of the confession outside of the presence and hearing of the jury.[3] The following discussion ensued:

\* \* \* \* \* \*

"Mr. Prewett: I would like to ask counsel if there is any contention here on part of the defense on the last statement that was taken in the office of the Prosecuting Attorney, is there any contention that it was not made voluntarily or with threats or coercion?

"Mr. Thomas: No.

\* \* \* \* \* \*

"Mr. Thomas: The defendant has stated to me repeatedly that he has been accorded every kindness and every consideration at the hands of the County officers only.

"Mr. Prewett: With permission of the defense counsel, I would like to ask if the defendant personally made that statement?

"Mr. Thomas: (to the defendant) —Lonnie, you stated to me that you had been well treated by the officers while in the County Jail?

"The Defendant: (Lonnie B. Mitchell) Yes, sir."

\* \* \* \* \* \*

■ It appears from the evidence adduced at the hearing held by this Court, as well as from the testimony contained in the state court record, now a part of the record of this action, that it was the "considered choice" of petitioner deliberately not to raise any contention that his confession was coerced and, therefore, there was a waiver of the right to make this argument now. Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). It is the view of this Court that petitioner " \* \* \* after consultation with competent counsel \* \* \* understandingly and knowingly forewent the privilege \* \* \* " of asserting the present attack on his confession. Fay v. Noia, supra at 439, 83 S.Ct. at 849.

### (b) *Voluntariness of the Confession*

Notwithstanding the waiver by petitioner of his right now to attack the constitutionality of the confession, petitioner was permitted to introduce evidence at the hearing in this Court to attempt to prove that the confession used against him was coerced through physical mistreatment at the hands of the Sheriff, and, hence, improperly admitted at the state court trial in violation of his federally protected rights. See Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958).

■■ Admittedly, if petitioner's will was overborne, or if his confession was not the product of a "rational intellect and a free will," his confession was coerced and thus not admissible. Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1962). This Court has reviewed all of the testimony taken at the hearing on this petition, as well as the testimony contained in the record of the state court trial, and the evidence is overwhelming that petitioner voluntarily and freely confessed to the rape of Mrs. Murphy on March 10, 1959, without any coercion whatsoever. The Court so finds, and petitioner's argument to the contrary is wholly without merit.

According to the testimony of Prewett, he explained in detail to petitioner his rights with regard to making the confession in his offce, telling petitioner then that the charge for rape was being investigated and would be filed, and that he did not have to say anything but that if he did it could be used against him. All of this was explained to petitioner prior to his making the confession. Mr. Prewett observed that petitioner was not handcuffed in his office, and he further stated "clearly, unambiguously and un-

---

**3.** This discussion is fully set out in the transcript of the state court record. See Record, pp. 90–93, Mitchell v. State, 230 Ark. 894, 327 S.W.2d 384 (1959) (hereinafter cited as State Court Record).

equivocally" that petitioner was never "mistreated, abused or man-handled in any way" in the office; and, furthermore, he was not abused at any time by Sheriff Bishop to his knowledge. According to Mr. Prewett, petitioner "wanted to give a statement" and this statement was recorded in its entirety, the recording machine being stopped only to change records. Nothing was omitted, and petitioner was treated with the "utmost dignity and respect."

The content of the confession is fully set out in detail in the State Court Record.[4] This statement not only contains an admission by petitioner that he committed the robbery and rape of Mrs. Murphy, but also a full explanation of petitioner's activities on the evening of March 9th and the morning of March 10th. It is clear from this statement that petitioner was fully aware of the fact that he did not have to say anything and that if he did it could later be used against him. When asked, "Do you still understand that you do not have to give any statement, and that anything you give is voluntary of your own free will and accord?", petitioner responded, "Yes, sir."

As previously mentioned, in the numerous post-conviction procedures pursued by Mitchell, this is the first time he has asserted that his confession was obtained by coercion. Although his mother visited him at the jail several times before the trial, he made no statement about it to her. One of the first inquiries of his attorney, Thomas, was for a description of the circumstances under which the confession was given. He made no claim of coercion to Thomas. His father, who had interested himself in petitioner's behalf, sat at the counsel table by him during the trial, but petitioner testified that he did not mention it to his father. Either one or two days after his conviction, and while he was still in jail at El Dorado, through his attorney's efforts Wylie Branton of Pine Bluff, Arkansas, an outstanding Negro attorney, was prevailed upon to go to El Dorado to visit Mitchell with a view of determining whether Branton would accept employment as his counsel. Petitioner said he had a long conversation with Branton but made no mention to him of any mistreatment. All of this makes his story now simply incredible.

Petitioner now argues only that the confession was illegally obtained, and in no way questions the procedure used in the state court trial by which the confession was admitted into evidence. Nevertheless, the recent decision by the United States Supreme Court, in Jackson v. Denno, 84 S.Ct. 1774, 12 L.Ed.2d 908, (1964), compels discussion of this point, even though not now raised.

In *Denno*, the Supreme Court reversed a conviction for murder because the conviction was founded upon a confession not properly determined to be voluntary. The Supreme Court held unconstitutional the New York procedure whereby the trial judge made a preliminary determination regarding a confession and excluded it if in no circumstances it could be deemed to be voluntary, but admitted it if the evidence presented a fair question as to voluntariness, leaving to the jury under proper instructions the ultimate determination of its voluntary character and also its truthfulness. Jackson v. Denno, supra, 84 S.Ct. at 1787 and 1788, overruling Stein v. New York, 346 U.S. 156, 172, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). As concurring Justice Black observed, the Arkansas Supreme Court has followed this so-called "New York" rule. Jackson v. Denno, supra, 84 S.Ct. at 1800–1802, Appendix A to opinion by Justice Black. E. g., see Monts v. State, 233 Ark. 816, 349 S.W.2d 350 (1961). Burton v. State, 204 Ark. 548, 163 S.W. 2d 160 (1943); McClellan v. State, 203 Ark. 386, 156 S.W.2d 800 (1941). Even so, the instant case must be distinguished from these cases, as well as Jackson v. Denno, supra, in which Mr. Justice White, speaking for the majority, noted that procedure whereby "*the jury passes on voluntariness only after the judge has*

---

4. State Court Record, pp. 103–107. See also *id.*, pp. 97–103.

*fully and independently resolved the issue against the accused"* does not pose hazards to the rights of a defendant. (emphasis added)

In the case at bar, as already pointed out, when objection was made to the introduction of the confession on the sole grounds that it was obtained prior to arraignment and without presence of counsel, the court convened in chambers, with the petitioner present, in order to hear argument by counsel outside of the hearing and presence of the jury. The statement by counsel that there was no contention that the confession was involuntary, later corroborated in chambers by the frank admission of petitioner himself that he had been well-treated at the county jail, prompted the following response by the court to the objection to the confession in the presence of the parties: [5]

"I think that if the statement was given to the officers while he was in custody and if he was apprised of the charge pending against him, and that he voluntarily and without force and without promise and without hope of reward, made the statement of his own volition that the statement can be properly introduced."

Accordingly, the confession was permitted to be introduced into evidence at the trial under instructions by the court to the jury.

■■ Clearly, the court resolved "fully and independently" the issue of voluntariness against the petitioner, this determination being based on the statement by petitioner's counsel made in the presence of petitioner, as well as petitioner's own admission that he had been well-treated while in the county jail. The trial judge's conclusion that the confession was voluntary is not only "ascertainable from the record," but also "clearly evident from the record." Either is sufficient. Jackson v. Denno, supra at 1781–1783. Admittedly, the trial judge instructed the jury as to the admissibility

of the confession, but as the Supreme Court observed in Jackson v. Denno,. supra at 1781, "Once the confession is. properly found to be voluntary by the judge, reconsideration of this issue by the jury does not, of course, improperly affect the jury's determination of the credibility or probativeness of the confession or its ultimate determination of guilt or innocence." Therefore, petitioner's constitutional right to have the issue of coercion resolved independently by the court was fully preserved at the state court trial, and was not in any way infringed.

### (c) *Petitioner's Right to Counsel at the Time of the Confession*

Petitioner does not now argue that any federal right was violated by not having counsel on his behalf present at the time petitioner gave his confession to the prosecuting attorney. However, petitioner at his trial did object to the admissibility of the confession because it " * *. was made * * * before he had been given counsel, or before counsel had been appointed," as well as prior to conferring with counsel. The decision of the United States Supreme Court in Escobedo v. State of Illinois, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) warrants consideration of this point.

In *Escobedo*, the defendant was taken into custody on suspicion of murder because of information furnished by another suspect, and later convicted on this charge. Immediately upon his arrival at the police station, defendant requested to see his attorney but was repeatedly refused. Likewise, at the station defendant's attorney was not permitted to see defendant, despite numerous requests. Defendant was interrogated for some time and was never informed of his constitutional right to remain silent. During the interrogation, defendant made an incriminating statement implicating himself in the crime which was later used against him at his trial. The Supreme Court reversed the conviction, and after discussing the defendant's right to coun-

---

5. State Court Record, p. 91.

sel, Mr. Justice Goldberg concluded, Escobedo v. State of Illinois, supra at 1765:

"* * * [W]here, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, *the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent,* the accused has been denied 'the assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment', (citation omitted), and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (emphasis added)

■ In this case, the police did not carry out any prolonged interrogation of petitioner. Nor was there any attempt to elicit incriminating statements from petitioner. Petitioner was appointed counsel on the charge of robbery several days prior to his giving the confession of rape in the prosecuting attorney's office, and he did not request the presence of counsel at the time he made the confession, even though he was told that the charge against him of rape was pending. Petitioner asked to make the statement, and he was warned of his right to remain silent. When petitioner made the confession there was a telephone in the office and his parents were in the outer office. Thomas was never denied access to his client, but freely visited him without question. At that time, petitioner had not been charged with the crime of rape. He had been arraigned for the crime of robbery. Certainly, the facts of the case at bar do not fall within those

of *Escobedo,* and, therefore, it must be distinguished. Petitioner was not denied assistance of counsel within the *Escobedo* holding.

Petitioner has not raised any argument that the holdings in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L. Ed.2d 246 (1964), and Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L. Ed.2d 1265 (1959), necessarily establish a violation of petitioner's right to counsel. Both *Massiah* and *Spano* are clearly distinguishable from the instant case in which petitioner, himself, requested to make a statement. In *Massiah,* federal agents used an electronical device surreptitiously to elicit an incriminating statement from the accused; and, in *Spano,* police questioned the accused for five hours to no avail, despite his requests to see counsel, and finally obtained a confession by getting a friend of the accused to trick him into making a confession. Petitioner was never subjected to any "secret interrogation" as in *Massiah;* nor was petitioner subjected to "massive" interrogation during the early hours of the morning, as well as deceit, in utter disregard of requests to see counsel, as in *Spano.* On the contrary, petitioner sought to give the police a statement and he never requested to see counsel. He was fully advised of his right to remain silent. Petitioner, during normal business hours, gave complete narrative statements, and it cannot be said that he was the victim of "leading questions of a skillful prosecutor in a question and answer confession." *Id.,* 360 U.S. at 322, 79 S.Ct. at 1206. Hence, neither *Massiah* or *Spano* point to any violation of petitioner's federal right to counsel.

## II. INSANITY

The legal defense of insanity was not raised by petitioner at the state court trial. Nor did petitioner present any evidence of insanity at the hearing on this petition.[6] Previously, while the peti-

---

**6.** As to this issue raised in the Mandate of the Court of Appeals, petitioner's counsel stated at the hearing on this

petition that he had "no further evidence to offer * * * than that which is already in the record." Further, he stat-

**504**

tion for coram nobis was pending in the Arkansas Supreme Court, petitioner was examined by a psychiatrist and a psychologist of his own choice and also at the request of the Arkansas Supreme Court, by psychiatrists of the Arkansas State Hospital, and all found him to be legally sane. Mitchell v. Henslee, supra, 208 F.Supp. at 536.

In discussing the issue of insanity, the Arkansas Supreme Court in Mitchell v. State, 234 Ark. 762, 354 S.W.2d 557 (1962), discussed the report of the private psychiatrist selected by petitioner, Dr. Elizabeth Fletcher, whose report reflected collaboration with another psychiatrist, as follows: "Dr. Fletcher's report concludes that Mitchell is without psychosis: 'It is felt that he is competent and knows right from wrong.' There is nothing in the report that tends in any way to show that Mitchell was insane, either at the time of the commission of the offense, or at the time of his original trial, or at any other time. A careful perusal of the report convinces us that Mitchell was sane at all times."

█ In view of the uncontroverted medical findings as discussed by the Arkansas Supreme Court that petitioner was sane at the time of the commission of the offense, and the fact that petitioner has introduced no evidence on this issue, petitioner's allegation of insanity must fail. In fact, there is simply nothing in the record to support this contention.

### III. LEGAL REPRESENTATION

Petitioner strongly argues that he did not have access to counsel or effective assistance of counsel at the state court trial, and hence he was deprived of a fair hearing as guaranteed by the United States Constitution.

According to the testimony of petitioner, he first saw an attorney after he gave his second statement to the Prosecuting Attorney. At his arraignment for the crime of robbery on March 12th, the record reflects that petitioner was advised that he did not have to make a statement to anyone but if he did it could be used against him, and, further, that he had the right to be represented by counsel.[7] The Court then appointed Thomas to represent him. On March 16, 1959, petitioner was arraigned for the crime of rape, and a plea of not guilty was entered.

Petitioner testified that after the second arraignment he did not see his attorney again until the day of trial on March 31, 1959. Just before the trial began, petitioner stated that he saw Thomas for a few minutes. During the twenty-one day interval between the arraignment and the trial, according to petitioner, he did see his mother three times, and this was his only outside contact during this period. Petitioner further stated that he did not see Thomas at any time after the trial. On cross-examination, petitioner denied ever discussing the case with Thomas, or discussing with Thomas anything about the jury, witnesses, or his alleged drunkenness on the night of the ninth. Petitioner further even denied that the Circuit Court informed him of his right to counsel or his right against self-incrimination, which was contradicted by Circuit Judge Tom Marlin, who testified to the contrary.

According to the testimony of Thomas, an experienced trial lawyer admitted to practice in Arkansas since 1927, he talked to petitioner about twenty to thirty minutes sometime after petitioner was arraigned on the robbery charge but prior to his arraignment for rape. Thomas distinctly recalled visiting petitioner at the jail four or five times prior to trial and thought that he had visited

---

ed that he would " * * * rest on whatever is in the record." Counsel for respondent did introduce certified copies of medical reports previously considered by the Arkansas Supreme Court in

Mitchell v. State, 234 Ark. 762, 354 S.W. 2d 557 (1962).

7. State Court Record, pp. 85 and 86, 97. This was also established by testimony at the hearing on the instant petition.

him on other occasions. He had talked to petitioner on these visits and the length of the conversations varied between twenty to thirty minutes. Thomas had also talked with the Sheriff, the Prosecuting Attorney, and petitioner's father, as well as his mother. Thomas testified that he discussed the confession in detail with petitioner, and observed that "we just did not have any witnesses." Thomas stated that he urged the defense of insanity to petitioner but petitioner refused to permit him to assert this defense at the trial. He further stated that he selected the jury "with extreme care" and discussed each juror with petitioner. Thomas remarked that though he had handled many criminal cases, no one represented by him had ever received the death penalty and he did not want to see this penalty imposed upon petitioner. Thomas concluded, "I dreaded the confession with all of my heart."

The testimony given by Thomas that he had visited petitioner at the jail was corroborated by Zadie Richmond, who was a trusty at the jail during the time petitioner was confined there. Petitioner's father recalled that Thomas had talked to him before the trial, during the trial when he sat with Thomas and petitioner in the courtroom, as well as after the trial when they later went to Pine Bluff in an effort to engage the services of Wiley Branton, a Negro attorney, in order to assist in the appeal.

Petitioner's testimony is in direct conflict with the clear weight of the evidence, and it is the view of this Court that petitioner's argument that he did not have access to counsel or effective assistance is completely frivolous. See generally cases collected in Quality of Counsel in Criminal Cases, 8 Ark.L.Rev. 484 (1954). The evidence establishes beyond question that petitioner not only had free access to counsel but also that he was well represented, without charge, by an experienced trial lawyer, who ably and conscientiously defended petitioner at his trial and who diligently prosecuted the original appeal to the Arkansas Supreme Court.

## IV.  SELECTION OF THE JURY

Petitioner argues that racial discrimination was practiced in the selection of the jury at his trial in state court. In support of this argument, petitioner relies on the testimony of the three jury commissioners, Mr. W. D. Moore, Jr., Mr. D. R. James, Jr., and Mr. Robert Mason, all of whom selected the jury panel which served for the April term of Court when petitioner was tried in the Union County Circuit Court.

The argument of jury discrimination now urged was not made at petitioner's trial, nor in the original appeal to the Arkansas Supreme Court. However, petitioner did file a motion to quash the first panel selected by the jury commissioners because of racial discrimination, and this motion was granted. The record reflects that after granting this motion, the Circuit Court Judge instructed the jury commissioners that they were not to make any discrimination in the selection of the new panel because of race, color or creed.[8] A new panel was selected, and petitioner did not object to this panel. The new regular panel consisted of twenty-five whites and five Negroes; and the alternate consisted of thirty-three whites and seven Negroes. The jury finally selected to try the case consisted of ten white persons and two Negroes.

Moore, one of the jury commissioners employed at a local chemical plant and resident of El Dorado practically all of his life, testified that the jury commissioners kept no records personally, but he and the two other jury commissioners used the poll tax receipt books, as well as a list of those who had previously served as jurors. The poll tax receipt book did contain racial designations in accordance with Ark.Stat.Ann. § 3–227 (1947); and the state court record indicates that there were 14,006 qualified electors in the county at the time. Moore

8.  State Court Record, pp. 11 and 12.

testified that he did not personally know many Negroes in the area; nor did he know Negro property owners. However, he did know about one hundred Negroes in the local labor union, as well as others in the community whom he had met through the many civic organizations in which he had been active. According to his testimony, Moore, along with the other two jury commissioners, had been instructed to select jurors without regard to race, and he had made no conscious effort to include Negroes or exclude them. In fact, Moore testified that his personal feeling had been influenced by a local judge who told him to "choose a man for a juror whom you would not mind sitting if you were a defendant"—and this was the criteria, according to Moore, which he kept in mind in selecting jurors.

James, another jury commissioner and local hotel manager residing in El Dorado all of his life except for time spent in the service and college, stated that he knew Negroes in the area, some whom he had met through real estate transactions and others whom he knew through the hotel, but not socially. James corroborated Moore's account of how the jury was selected. He also stated that while he made no special effort to acquaint himself with the Negroes in the area, he had chosen some Negroes for jury service, although he did not offhand recall specific names. He further testified that he made no effort to include or exclude Negroes, rather he made up a list of persons whom he regarded would make good jurors.

Mason, another jury commissioner and lifetime resident of the area employed by Urbana Lumber Co., testified that he came in contact with many Negroes through his job as payroll clerk with the lumber company. He further testified that he had selected Negroes for the jury panel which tried petitioner, but he had made no particular effort to include Negroes on this list. He readily admitted that he had made no special effort to acquaint himself with Negroes, but he added that he knew Negro land owners and school teachers, having served as secretary of the local school board for approximately fifteen years.

This Court only recently in Maxwell v. Stephens, 229 F.Supp. 205, 212–216 (E.D.Ark.1964), fully discussed the right now asserted by petitioner against racial discrimination in the selection of a jury. In Bailey v. Henslee, 287 F.2d 936 (8th Cir. 1961), Judge Blackmun exhaustively discussed the principles which govern a federal district court's inquiry and factual determination of whether or not a jury has been impartially selected without regard to race or color, as required by the equal protection clause of the Fourteenth Amendment of the United States Constitution. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). Applying these principles to this case, it is the view of this Court that petitioner has failed to establish any racial discrimination in the selection of the jury by Mr. Moore, Mr. James and Mr. Mason, as alleged. On the contrary, it appears that the panel was fairly and impartially selected, and petitioner's federal right to have a jury chosen without regard to race or color was not in any way violated.

Finally, petitioner offered the testimony of Mr. A. R. Buckalew, a laboratory technician with the local chemical plant and resident of El Dorado for most of his life. He testified that he was a juror on the panel at petitioner's trial in state court, that he was a justice of the peace, and that he personally knew the jury commissioners. Admittedly, a ground for a peremptory challenge exists where a juryman is a justice of the peace, Ark.Stat.Ann. § 39–230 (Repl.1962); however, the failure to challenge cures any defect. Cureton v. State, 117 Ark. 655, 174 S.W. 810 (1915). Hankins v. State, 118 Ark. 419, 176 S.W. 691 (1915). Since petitioner did not challenge Mr. Buckalew at the trial, petitioner has waived this defect and, therefore, he cannot now raise it. Besides, no federal question is involved.

V. ALLEGED UNCONSTITUTIONALITY OF THE ARKANSAS RAPE STATUTE

Petitioner argues the unconstitutional application of the Arkansas Rape Statute, Ark.Stat. § 41–3403 (1947). This argument is based on his contention that Negro men charged with rape upon white women receive the death sentence, whereas white men either receive only life imprisonment for this charge or are charged with a lesser offense than rape. In support of this contention, petitioner relies primarily upon the testimony of Dr. John T. Herron, State Health Officer and Registrar of Vital Statistics, as well as the statistics compiled by Mr. Dan D. Stephens, Superintendent of the Arkansas State Penitentiary.

Dr. Herron testified as to the number of deaths by electrocution for rape in the State of Arkansas since February 20, 1913. These statistics are as follows:

| 1. | Lee Sams | Negro male | Sept. | 5, | 1913 |
|----|----------|------------|-------|-----|------|
| 2. | Fred Pelton | Negro male | Mar. | 28, | 1914 |
| 3. | Freeling Daniels | Negro male | Nov. | 25, | 1932 |
| 4. | George Hill | Negro male | June | 30, | 1933 |
| 5. | Jessie Amos | Negro male | Oct. | 15, | 1937 |
| 6. | Theo Thomas | Negro male | June | 24, | 1938 |
| 7. | Frank Eaten | Negro male | June | 24, | 1938 |
| 8. | Fred Arnell | Negro male | May | 19, | 1939 |
| 9. | James Carruthers | Negro male | June | 30, | 1939 |
| 10. | James Carrolton | Negro male | June | 30, | 1939 |
| 11. | John Lee Riney | Negro male | June | 20, | 1941 |
| 12. | Stoney Allison | Negro male | Nov. | 20, | 1942 |
| 13. | Clifton Holmes | Negro male | June | 10, | 1947 |
| 14. | Albert Hodges | Negro male | Jan. | 17, | 1947 |
| 15. | Edward Pugh | Negro male | July | 2, | 1948 |
| 16. | Milas L. Palmer | Negro male | June | 17, | 1949 |
| 17. | Wesley Hilbert | Negro male | Dec. | 16, | 1949 |
| 18. | Hollis Needham | White male | Mar. | 17, | 1950 |
| 19. | Herman Maxwell | Negro male | June | 6, | 1952 |
| 20. | Leo Scarber | Negro male | Sept. | 21, | 1956 |
| 21. | Charles Franklin Fields | White male | Jan. | 24, | 1964 |

Although Dr. Herron's statistics contained a breakdown by county, this information was not introduced into evidence. According to Dr. Herron, the total number of individuals executed for rape was twenty-one, only two of whom were white men. Stephens testified that according to his records for this period, nineteen Negroes and two white men had been executed for the crime of rape. Stephens further testified that according to his records over the past fifteen years, thirty white males and twenty-four Negro males had been sentenced to life imprisonment for the crime of rape.

The argument [9] now raised by petitioner was discussed in detail and rejected by this Court in Maxwell v. Stephens, supra, 229 F.Supp. at 216 and 217. The same argument was also considered and decided adversely to the position now urged by petitioner by the Arkansas Supreme Court in Maxwell v. State, 236 Ark. 694, 370 S.W.2d 113 (1963). The only additional evidence which has not been previously considered

9. A discussion of a related argument appears in Packer, Making the Punishment Fit the Crime, 77 Harv.L.Rev. 1071 (1964). See the author's comment in note 35. *Id.*, at p. 1082.

in support of this argument is the record of life sentences imposed for rape convictions. Petitioner now relies solely upon these statistics reflecting executions and life sentences on record at the Arkansas State Penitentiary in support of his argument.

Petitioner has provided absolutely no information as to the circumstances of the individual rapes committed by the offenders enumerated in the state statistics, and, unfortunately, even the published reports of the Arkansas Supreme Court furnish incomplete data since some of the convictions were apparently never appealed.[10] Most of these cases as reported do not indicate the race of the victims, and, in some cases this fact is ascertainable, if at all, only from the original transcript of the case on file with the Clerk of the Arkansas Supreme Court. Obviously, petitioner must at least establish the race of these victims in order for his argument to be considered.

Statistics such as these are essentially meaningless. Dr. Herron's tabulation on deaths by electrocution are from 1913 to 1964, a period of more than fifty years. In that period of time customs and attitudes of people are likely to change. It is difficult to see any logical connection between statewide statistics over a fifty year period of time and the

supposed racial prejudice of the jury which tried Mitchell in Union County in 1959. Oddly, if we go back to 1950, fourteen years ago, four men have been executed for rape—two white and two Negro. This, again, the Court believes to be meaningless.

The companion cases of Hamm v. State, 214 Ark. 171, 214 S.W.2d 917 (1948), and Palmer v. State, 213 Ark. 956, 214 S.W.2d 372 (1948), cert. denied 336 U.S. 921, 69 S.Ct. 639, 93 L.Ed. 1083 (1949), would seem to refute petitioner's argument. In these two cases, Hamm and Palmer, both Negroes, were tried separately and both convicted for the rape at gunpoint of a nineteen year old white woman in the presence of her male escort.[11] The jury sentenced Palmer to death and Hamm to life imprisonment. These cases might well suggest that the choice of punishment by the jury depends not upon the race of the attacker and his victim, but rather upon many factors entirely apart from any racial consideration, such as the brutality of the rape, the degree of credibility of the prosecuting witness, and the strength of the prosecution's case against the particular defendant. To what extent race is a factor, if at all, is open to question, and any determination in petitioner's favor in light of these statistics alone would be based upon sheer conjecture and

10. See, e.g., the following list of cases, complied by this Court: Daniels v. State, 186 Ark. 255, 53 S.W.2d 231 (1932); Amos v. State, 209 Ark. 55, 189 S.W.2d 611 (1934); Thomas v. State, 196 Ark. 123, 116 S.W.2d 358 (1938); Clayton v. State, 191 Ark. 1070, 89 S.W.2d 732 (1935) (discussing rape by James Carruthers); Allison v. State, 204 Ark. 609, 164 S.W.2d 442 (1942); Holmes v. State, 210 Ark. 574, 196 S.W.2d 922 (1946); Hodges v. State, 210 Ark. 672, 197 S.W.2d 52 (1946); Pugh v. State, 213 Ark. 374, 210 S.W.2d 789 (1948); Palmer v. State, 213 Ark. 956, 214 S.W. 2d 372 (1948), cert. denied 336 U.S. 921, 69 S.Ct. 639, 93 L.Ed. 1083 (1949); Needham v. State, 215 Ark. 935, 224 S. W.2d 785 (1949); Maxwell v. State, 216 Ark. 393, 225 S.W.2d 687 (1950); Scarber v. State, 226 Ark. 503, 291 S.W.2d

241 (1956); Fields v. State, 235 Ark. 986, 363 S.W.2d 905 (1963). See also, Bailey v. State, 215 Ark. 53, 219 S.W.2d 424, 9 A.L.R.2d 653 (1949); Batchelor v. State, 217 Ark. 340, 230 S.W.2d 23 (1950); Pemberton v. State, 221 Ark. 19, 251 S.W.2d 825 (1952); Watts v. State, 222 Ark. 427, 261 S.W.2d 402 (1953); McDonald v. State, 225 Ark. 38, 279 S.W.2d 44 (1955); Rogers v. State, 237 Ark. 437, 373 S.W.2d 705 (1963).

11. The race of the victim is indicated in the original transcript but not in the reported opinions of Hamm v. State, 214 Ark. 171, 214 S.W.2d 917 (1948), and Palmer v. State, supra Note 10. As previously observed by the Arkansas Supreme Court, such cases are not digested by race. Mitchell v. State, 233 Ark. 578, 346 S.W.2d 201 (1961).

speculation. The thrust of petitioner's argument ultimately is directed at the individual jurors, since it is within the province of the jury to impose the death sentence or a life term for the crime of rape. See Ark.Stat.Ann. § 43–2153 (1947). Suffice it to say that the proof offered does not establish the unconstitutionality of the Arkansas rape statute, as alleged.

CONCLUSION

In summary, the Court is convinced that petitioner's constitutional rights were preserved in the state court proceedings and were not in any way violated, as alleged. The Court's conclusion that petitioner's confession was not illegally obtained is based on the following factual determinations: (1) Petitioner desired to give the police a statement relating to the rape of Mrs. Murphy after he had been arraigned for the crime of robbery but before he had been charged with rape; (2) Petitioner, himself, freely and of his own volition, without any force or fear of threats or because of any promises, requested that he might make a statement relating to the rape of Mrs. Murphy; (3) Petitioner, being fully aware that he did not have to make any such statement and that if he did so it might be used against him, voluntarily, without any coercion whatsoever, confessed to the rape of Mrs. Murphy; (4) Notwithstanding that petitioner knew at the time when he confessed that he had appointed legal counsel, he did not request his presence; and (5) Petitioner was never denied the opportunity to confer with counsel at any time. Furthermore, the evidence clearly establishes that petitioner was sane at the time he committed the rape, that he had effective assistance of counsel throughout the state court proceedings, and that there was no discrimination practiced in the selection of the jury at petitioner's trial. It has not been established that there has been an unequal application of the Arkansas rape statute.

The petition for habeas corpus will be denied.