**Orion TROTTER and Albert Harris, Petitioners,**

v.

**Dan D. STEPHENS, Respondent.**
**Nos. PB–64–C–62, PB–64–C–63.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.
April 30, 1965.

George Howard, Jr., Pine Bluff, Ark., Thomas L. Cashion, Eudora, Ark., for petitioners.

Jack L. Lessenberry, Little Rock, Ark., for respondent.

GORDON E. YOUNG, District Judge.

This habeas corpus proceeding is brought by petitioners, who were tried together and convicted for the crime of rape in the Circuit Court of Drew County, Arkansas, on April 11, 1963, and sentenced to death. The convictions were affirmed by the Arkansas Supreme Court in the case of Trotter and Harris v. State, 237 Ark. 820, 377 S.W.2d 14 (1964), cert. denied 379 U.S. 890, 85 S.Ct. 163, 13 L.Ed.2d 94 (1964). By order of this Court executions were stayed and a hearing held on the consolidated petitions consistent with the principles laid down by the United States Supreme Court in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

Petitioners allege that their convictions were obtained in violation of their constitutional rights, which they allege, in substance, as follows: (1) Petitioners were tried in an atmosphere so hostile and adverse that they could not receive a fair trial; (2) Petitioners were not ac-

corded separate counsel;[1] (3) There has been an unequal application of the Arkansas rape statute, Ark.Stat.Ann. § 41-3403 (Repl. 1964), in that there has been a disparity in the sentence of Negro defendants charged with rape of white women and white defendants charged with rape; (4) The imposition of the death sentence for the charge of rape is so erratic as to deny due process of law and conflicts with the mores and basic concepts of fairness of civilized societies; (5) The arrests without a warrant and without being carried before a magistrate and given a preliminary hearing, as well as the search of petitioner Trotter's home and car and petitioner Harris' apartment were unlawful; (6) Racial discrimination was practiced in the selection of the jury which tried petitioners; and (7) The two admissions made by Harris were improperly admitted into evidence.

By agreement of the parties, the state court record was made a part of the record here, and both parties were permitted to offer additional evidence. The parties have primarily relied upon the state court record and, accordingly, have designated the relevant portions in support of their respective arguments.

At the hearing held on the consolidated petitions, petitioners only offered evidence in support of their contentions that Harris was illegally arrested and his apartment unlawfully searched,[2] as well as evidence as to the number of lawyers in Drew County at the time of petitioners' trial,[3] the number of the state prosecutions for rape in Drew County for the past ten years,[4] and the statistics as to electrocutions for the crime of rape in Arkansas.[5] Respondent offered testimony as to the details of the arrest,[6] the selection of the jury which tried petitioners,[7] the prosecuting attorney's recollection of the prosecution of the case, including the arraignment and subsequent consolidation of the two cases for trial and the reputation of the defense counsel,[8] and finally the testimony of the defense counsel as to the conduct and preparation of petitioners' state court trial.[9]

1. Only petitioner Harris makes this argument, but since the two actions were consolidated for the purpose of the hearing and since petitioner Trotter has adopted petitioner Harris' brief, the respective contentions have been considered together. All of these contentions were made in the state court except the third and fourth contentions. It should be noted that petitioners have not contended at any time that there was any violation of their respective constitutional rights to counsel under the holding of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Nevertheless, this Court has considered the Escobedo case and is compelled to conclude that Escobedo is wholly distinguishable. See the discussion of Escobedo in The Supreme Court—1963 Term, 78 Harv.L. Rev. 143, 217–223 (1964).

2. Petitioner Harris' wife, present during the arrest as well as the trial, testified in this regard.

3. This was established by the testimony of Mr. James A. Ross, Sr., a Monticello attorney who assisted in the prosecution at the request of the prosecuting witness's family.

4. The Circuit Clerk of Drew County provided this information.

5. These statistics are set out in the opinion of this Court in Mitchell v. Stephens, 232 F.Supp. 497, 507 (E.D.Ark.1964).

6. Sheriff Jack Towler related the details and circumstances of the arrest.

7. Mr. Ed Grubbs, one of the jury commissioners who testified at the hearing in state court on petitioners' motion for a new trial, testified as to the selection of the jury.

8. Mr. Frank Wynn, prosecuting attorney for the Tenth Judicial District of Arkansas which includes Drew County, testified in this regard.

9. Mr. Tom Cashion, who conducted the defense and to whom Mr. Frank Wynn referred as having more experience with criminal cases than any other attorney in the district, stated that he had visited with petitioners prior to trial about March 1. Mr. George Howard, an experienced Negro attorney, was employed by petitioner Harris after the trial and represented Harris in the appeal of the conviction, as well as in the present proceeding.

■■ The contention that petitioners did not receive a fair trial because of adverse atmosphere and the contention that they should have been accorded separate counsel were fully and adequately discussed by the Arkansas Supreme Court and rejected in a well considered opinion by Chief Justice Carleton Harris. Trotter and Harris v. State, supra, 237 Ark. at 829–831, 841–844, 377 S.W.2d 20 and 21, 27–29. Any further discussion, particularly in view of the fact that no additional evidence has been offered, would serve no useful purpose and is unnecessary. Townsend v. Sain, supra, 372 U.S. at 313, 83 S.Ct. 745. Suffice it to say that after a thorough examination of the state court record this Court is convinced that no federal right was violated in either of these particulars. Compare Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (adverse atmosphere); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941) (separate counsel).

■ The arguments attacking the constitutionality of the Arkansas rape statute, Ark.Stat.Ann. § 41–3403, supra, on the grounds of violating the equal protection clause and the due process clause of the Fourteenth Amendment, as well as the argument that the penalty of death for rape is violative of the Eighth Amendment's prohibition against "cruel and unusual" punishment as applied to the states through the Fourteenth Amendment [10] have previously been considered by this Court and rejected in Maxwell v. Stephens, 229 F.Supp. 205, 216 and 217 (E.D.Ark.1964), and Mitchell v. Stephens, 232 F.Supp. 497, 507–509 (E.D.Ark.1964) (Discussing the Fourteenth Amendment argument). See also Maxwell v. State, 236 Ark. 694, 370 S.W. 2d 113 (1963). Now, by statistics reflecting somewhat incompletely the disposition of the rape charges filed in Drew County, Arkansas, for the past ten years, petitioners seek to invalidate the Arkansas rape statute. Assuming these arguments have not already been waived under Fay v. Noia, supra, discussed in Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), and Cobb v. Balkcom, 339 F.2d 95 (5th Cir. 1964), it is the view of this Court that these arguments attacking the constitutionality of the statute are wholly without merit.

The remaining contentions to which the following discussion is limited are listed as follows: (1) The Arrest and Search; (2) Selection of the Jury; and (3) Admissions by Harris.

## I. THE ARREST AND SEARCH

The commission of the crime by two young Negro men on a white woman was conclusively established by the evidence. Its details are sufficiently described in the opinion affirming petitioners' convictions. Trotter and Harris v. State, supra. The crime was committed some-

10. See the discussion of these arguments in Packer, Making the Punishment Fit the Crime, 77 Harv.L.Rev. 1071 (1964), in which the author notes that seventeen states and the District of Columbia provide the death penalty for rape, most of these jurisdictions being characterized as "southern." Id. at p. 1073. In considering the question raised by the Eighth Amendment argument that the death penalty is a "cruel and unusual" punishment for the crime of rape, the sordid details of the brutal armed rape by a syphilis-infected attacker and his confederate upon a helpless young woman, who was left nude to walk several miles for help in the early hours of a wintry morning after being shot, beaten and raped, merit reading. Record, pp. 186(160)–208(182). Trotter and Harris v. State, 237 Ark. 820, 377 S. W.2d 14 (1964) (hereinafter cited as State Court Record). Compare the facts and punishment accorded in the companion cases of Hamm v. State, 214 Ark. 171, 214 S.W.2d 917 (1948), and Palmer v. State, 213 Ark. 956, 214 S.W.2d 372 (1948) to that of the instant case. Note this Court's comment in Mitchell v. Stephens, 232 F.Supp. 497 (E.D.Ark.1964) in discussing the Hamm and Palmer cases. Id. at 508.

time after the hour of one o'clock Sunday morning, February 17, 1963.

The victim was taken to the hospital around four o'clock the morning of the rape, where she was examined by the doctor and questioned by the police. By the time the victim was brought to the hospital her male escort, who had been with her at the time she was abducted by the two Negro men, had furnished the police with a general description of the two attackers as well as a description of their automobile which was described as a 1953 or 1954 model Plymouth automobile. At the hospital, in addition to talking to the victim, Sheriff Towler questioned a young Negro man who happened to be in the hospital and was well known to the Sheriff. The Sheriff described the automobile and the location where the crime had occurred and asked if he knew anyone "white or colored" in that area who owned such an automobile. The young man stated that Orion Trotter owned such an automobile and the Sheriff, remembering that he had arrested Trotter on a previous occasion for the crime of robbery of a woman, proceeded to Trotter's home, accompanied by the victim's escort, her brother-in-law, and State Police Captain Griffin. They reached Trotter's home around 5:00 a. m.

Upon arrival, the Sheriff noticed an automobile fitting the description given to him earlier parked in the driveway. The Sheriff directed his flashlight through the window at the rear seat.[11] Captain Griffin felt of the warm hood.[12] Both of the men opened one of the car doors and noticed stains on the seats, but the Sheriff suggested seeing Trotter before looking further,[13] and the two men proceeded to the front door of the house, leaving the victim's escort and brother-in-law at the car.[14] The Sheriff and Griffin knocked on the front door "three or four times."[15] Petitioner Trotter came to the door clad in a pair of shorts and the Sheriff pushed the door open and walked in. Trotter walked to his bed and sat down. The Sheriff, noticing a stain on the front of Trotter's shorts, began questioning Trotter about his whereabouts the night before. Trotter, who was married but was living with his mother, related that he had been out that night with his girl friend and two other friends. The Sheriff warned Trotter that he did not have to say anything and then began questioning him about the details of what he had done that night. Trotter could not explain the stain on his shorts, which the Sheriff upon closer inspection determined to be blood, or the blood on the right sleeve and tail of a shirt he had worn that night and which the Sheriff noticed near his bed. The Sheriff then placed Trotter under arrest and Trotter dressed and drove the Sheriff to the City Jail in the Plymouth automobile parked outside, which later proved to be registered in Trotter's name.[16]

After taking Trotter to jail, the Sheriff, Griffin, the victim's escort, and her brother-in-law, accompanied by City Policeman Newton, proceeded to the home of Trotter's girl friend, because, according to Trotter, he had been with her earlier that night. His girl friend stated that when she and Trotter had gotten home that night she had left Trotter with

---

11. State Court Record, p. 108(82) and 109(83).

12. Id. at 174(148).

13. Id. at 109(83).

14. At the state court trial, the victim's escort testified that while the Sheriff and Griffin talked to Trotter, he and State Trooper Mitchell raised the hood on the car, felt of the motor, shined a flashlight on the rear seat, noticed dampness on the seat and bloodstains on the left rear door. Id. at 70(44) and 71(45).

15. Id. at 109(83).

16. For details of Trotter's arrest, according to the Sheriff, see id. at 109(83)–111 (85); according to Capt. Griffin, id. at 173(147)–175(149).

Albert Harris.[17] The Sheriff and Griffin, accompanied by City Policeman Newton then immediately went to the apartment of Albert Harris, where Harris lived with his wife. When they arrived, the Sheriff knocked on the door for some time and finally Harris' wife came to the door and opened it. The Sheriff walked inside and questioned Harris, who was in bed. Harris stated at first that he had been out with a friend that night and when questioned about the clothes he had worn that night Harris directed the Sheriff to a pair of trousers on a hanger in the closet. After examining these and concluding that the trousers had not been worn recently, the Sheriff requested again to see the trousers Harris had actually worn. Harris then got out of bed, went into the adjoining room with the Sheriff and got a pair of corduroy trousers lying on a table and handed them to the Sheriff. The Sheriff immediately examined the trousers and found Harris' billfold, containing a lady's wristwatch which his wife said did not belong to her and which subsequently was identified as belonging to the victim. The Sheriff then told Harris that he had some explaining to do although "he did not have to tell * * * anything and if he did it probably would be held against him in Court."[18] Harris then related to the Sheriff that he had been with Trotter that night and had participated in the attack upon the couple parked in a car—denying, however, that he had actually had intercourse with the victim, and stating that "he just went along for the ride."[19] Upon further examination, the Sheriff noticed blood on the front of the corduroy trousers. The Sheriff then placed Harris under arrest and took him to the jail, taking the shorts and corduroy trousers as well. The time of this arrest was about six o'clock Sunday morning. Later, about eight o'clock that morning, the victim's escort identified Harris at the jail and Harris admitted seeing him the night before.[20] At about the same hour that morning, the Sheriff and State Trooper Mitchell searched Trotter's car parked in front of the Courthouse and found in it a red billfold belonging to the victim, as well as blood stains on the side panel and the rear seat, both of which were removed for laboratory testing of the stains.[21] Still later that morning, sometime after nine or ten o'clock, the Sheriff and Griffin returned to Trotter's house where they obtained a pistol from Trotter's mother which was later determined to be the gun used upon the victim and

17. For the details of this conversation, see State Court Record, pp. 112(86) and 113 (87), according to the Sheriff, and pp. 176(152) according to Capt. Griffin. City Policeman Newton testified that he had seen Trotter in front of his girl friend's house that night and, consequently, Newton had no trouble in finding the girl friend's house with the Sheriff that morning. Id. at 179(153).

18. Id. at 118(92). At the hearing in the instant case, Harris' wife testified that the Sheriff did not inform Harris of his constitutional rights and further that Harris made no admission. It should be pointed out that the state court record indicates that apparently she was not at all times in the same room with Harris, though, admittedly, there is no evidence that she was beyond hearing any conversation between the Sheriff and Harris.

It is abundantly clear, however, that Harris was at no time ever abused, threatened, or subjected to duress by the Sheriff. Upon cross-examination at this hearing, the Sheriff said that he was not positive whether he warned Harris of his constitutional rights at his home or in the jail.

19. Id. at 119(93).

20. The victim's escort testified at the trial that he asked Harris at the jail, "Do you remember me?" and Harris answered, "Yes, I saw you last night." Id. at 73 (47). This testimony was corroborated by City Policeman Newton who was at the jail at the time and heard the conversation. Id. at 180(154).

21. For details of the search, according to the Sheriff, see id. 122(96)–124(98); according to Trooper Mitchell, see id. 184 (158).

her escort.[22] Thus, it appears that all of the items taken by the police and later used as evidence against both Harris and Trotter in the state court trial were obtained in less than ten hours after the crime was committed and within approximately five hours after the first arrest was made.

(a) *Petitioners' Arrests Without A Warrant*

■ Petitioners argue that their respective arrests without a warrant and without being taken before a magistrate and given a preliminary hearing were unlawful and in violation of their federal rights under the United States Constitution. Admittedly, petitioners were not carried before a magistrate and given a hearing, apparently because of the early hour of Sunday morning. However, bench warrants were issued later that day and petitioners, by order of court, were transferred to the State Penitentiary for safe keeping. The arrests are subject to the test of reasonableness under the Fourth and Fourteenth Amendments. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1962). See also Robinson v. United States, 327 F.2d 618 (8th Cir. 1964). Under the law of Arkansas, an arrest without a warrant is authorized when a felony has been committed and the arresting officer has reasonable grounds to suspect the particular person arrested. Ark.Stat. Ann. § 43–403 (Repl. 1964). See also Lane v. State, 217 Ark. 114, 229 S.W.2d 43 (1950). Thus, the question now raised is whether or not the Sheriff had reasonable grounds to suspect Trotter and Harris, since it is clear that a felony had in fact been committed at the time. Compare Pigg v. United States, 337 F.2d 302 (8th Cir. 1964), and cases cited. This Court concludes that the evidence overwhelmingly establishes that reasonable grounds did exist and hence the arrests without a warrant were not unlawful and did not violate the federal rights of Trotter and Harris.

Petitioners were both confronted by police with questions in connection with the crime within several hours after it had been committed. The police were first furnished information by the victim's escort who had fought with Harris and Trotter at the scene of the crime and who had seen them both there, as well as Trotter's automobile which he also described. The information later given to the police by the young Negro man at the hospital that Orion Trotter owned such a car as described caused the police immediately to go to Trotter's house where they found a car fitting the description furnished to them. There they also found Trotter, himself, clad in bloodstained shorts. Upon further examination they discovered his bloodstained corduroy trousers worn earlier that evening. Certainly, this was ample evidence to give the police reasonable grounds to arrest Trotter, and was not "mere suspicion" within the prohibition of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962), as petitioners suggest.

As to the later arrest of Harris, the grounds were even stronger. The police established from Trotter's girl friend that Harris and Trotter had been together that night and when confronted with his bloodstained shirt and the victim's wristwatch found in his billfold, Harris admitted his involvement. It is difficult to imagine more incriminating evidence or reasonable grounds to arrest Harris for the rape and attempted murder.

(b) *The Searches Of Petitioners' Rooms In Their Presence*

Petitioners argue that the items obtained from them at the time of their

---

**22.** Id. at 125(99)–127(101). No argument has ever been made questioning constitutionality of the police obtaining the pistol from Trotter's mother. The record reflects that the police told Trotter's mother that they were "looking for a gun that was involved in the alleged crime," and asked her if she wanted them to get a search warrant. She replied "Yes," and as the police started to leave she remarked that she had a gun and got it from under the mattress of Trotter's bed and handed it to the police.

respective arrests, i. e., the shorts and corduroy trousers from Trotter, and the shirt, corduroy trousers, and wristwatch from Harris, were the products of an unlawful search and seizure by the Sheriff and Captain Griffin, and hence they were deprived of their federally protected rights in this regard, as discussed in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

■ Admittedly, these items were obtained without a search warrant at an early hour. However, a search of the person or premises incident to a lawful arrest is permissible and does not violate any constitutional right against an unreasonable search and seizure. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). It follows that since the respective arrests were lawful under the circumstances these items were not illegally obtained. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958). However, this is not to say that the reasonableness of any search does not depend upon the facts and circumstances of each case. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Any search is unconstitutional which "shocks the conscience", Rochin v. People of California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) or deprives a right "implicit in the concept of ordered liberty." Palko v. State of Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). This Court has fully examined the transcript of the state court proceeding to examine the facts and circumstances of each search to determine the propriety of the conduct of the police.

The record clearly establishes that, as to Trotter, the Sheriff merely questioned him as to the stains on the shorts he he was wearing and then noticed the bloodstained trousers and shirt near his bed and confronted him with them; and as to Harris, the Sheriff requested to see the clothes worn the previous night and was directed to the corduroy trousers which contained Harris' billfold and the victim's wristwatch. The fact that the items taken were obtained incident to a lawful arrest and further that there was nothing unfair, unreasonable or oppressive in the conduct of the Sheriff and Captain Griffin in obtaining these items compel this Court to conclude that petitioners' rights against an unreasonable search and seizure were preserved. Compare Maxwell v. Stephens, supra, 229 F. Supp. at 209, and cases cited therein.

(c) *The Search of Trotter's Automobile*

■ Petitioners have questioned the constitutionality of the search of Trotter's car without a search warrant in front of the court house approximately two hours after the arrests. Although no evidence was presented at the hearing in the instant case and petitioners did not designate any portion of the state court transcript in support of this contention, this Court has reviewed all testimony given during the state court trial relevant to this search and it is the view of this Court that this search was not in any way violative of petitioners' rights against an unreasonable search and seizure.

The 1954 Plymouth automobile, later identified as belonging to Orion Trotter and the vehicle in which the rape occurred, was found by the Sheriff and Captain Griffin in front of Trotter's house. Trotter had known the Sheriff before and when he was taken into custody at his house that morning he personally drove the car with the Sheriff to the City Jail at the Sheriff's request. The Sheriff had noticed at the time of the arrest the stains on the car seat and the warm radiator. Indeed, the car itself was the principal clue in the investigation. The car was obtained incident to and contemporaneous with Trotter's arrest and the subsequent search of the car two hours later was merely part of one continuous act, even though interrupted by the arrest of Harris in the interim. Compare Caldwell v. United States, 338 F.2d 385, 387 and 388 (8th Cir. 1964). Like Ker v. State of California, supra,

**42**

Trotter's automobile was an instrumentality of the crime, and unlike Preston v. United States, supra, it was examined closely at the time of the arrest and searched a few hours later. Petitioners have at no time offered any testimony as to the impropriety or unreasonableness of this search. Suffice it to say that there was no federal right violated by the search of the car and the fruits of this search, i. e., the rear seat, the side panel and the red billfold belonging to the victim, were not unlawfully obtained.

## II. SELECTION OF THE JURY

Petitioners argue that racial discrimination was practiced in the selection of the jury impaneled at their trial in state court. Petitioners bottom their argument on the following facts: (1) The poll tax books used by the jury commissioners listed Negro and white electors separately; (2) These poll tax books contained racial designations; (3) One of the jury commissioners who helped to select the jury stated on cross-examination at the state court hearing on a motion to quash the jury panel in response to the question, "Why did you want them [Negroes] on there [the panel]?" answered, "Well that gives an equal jury." [23] (4) Negroes called for jury service for the past twenty-one consecutive terms in Drew County equal only 6.3% of the total number of persons called, and Negroes comprise 33.9% of the total population of this area and 25% of the qualified electors; and (5) Those Negroes called have been called repeatedly and are advanced in age.

The jury panel for the February term, 1963, of Drew County Circuit Court consisted of seventy persons, eight of whom were Negroes. Petitioners moved to quash this panel and a hearing was held on this motion before trial. At that hearing, testimony in regard to this motion was given by the Circuit Clerk and one of the jury commissioners. The Circuit Clerk testified as to the number of Negroes on the jury panels since the September term, 1957. The jury commissioner testified that the jury commissioners had been instructed by the court to select jurors without regard to race.[24] He further outlined the procedure which they had followed in accordance with these instructions. At the conclusion of the hearing, the motion was denied.[25]

At petitioners' trial, forty-one prospective jurors were examined on *voir dire*. Among those examined were five Negroes. Two of these Negroes were excused by the court for cause, one on account of illness and the other because he did not believe in the death penalty. Three of the other Negroes were excused by petitioners' counsel after the State's attorney had accepted each of them.[26] There were three Negroes among those remaining on the panel whose names were not called on *voir dire* because the jury of twelve had been accepted from those already called. Petitioners exercised only eight of their ten peremptory challenges.

Following the trial, petitioners made a motion for a new trial, alleging, *inter alia*, that racial discrimination had been practiced in the selection of the jury. A hearing was held on this motion and testimony in this regard was given by two of the jury commissioners,[27] the County Clerk,[28] the Circuit Court Clerk,[29] and several Drew County residents previously called for jury service.[30] The trial judge made a detailed finding as to the

23. Id. at 46(20).

24. Mr. Cecil T. Boone. Id. at 45(19)–49 (23).

25. Id. at 17.

26. Id. at 316.

27. Mr. Cecil T. Boone. Id. at 228(202)–243(217). Mr. Ed Grubbs. Id. at 291 (265)–293(267).

28. Id. at 225(199)–227(201).

29. Id. at 243(217)–219(245), 259(233)–272(246).

30. Arnett Spencer. Id. at 245(219)–250 (224). Arthur Brown. Id. at 251(225)–254(228). Joseph Simms. Id. at 255 (229)–258(232).

selection of the jury and the composition of the panel called for jury service and examined on *voir dire* at the trial.[31] The trial judge concluded:[32] "* * * This was the case of a jury composed of average American men and women applying the law to the evidence and returning verdicts in conformity with the law and the evidence. There is no doubt in the mind of this Court that had the same acts reflected by the evidence been committed by any other persons, be they white or any other race, the same penalty would have been exacted by any fair minded jury."[33] The motion for a new trial was denied.[34]

In Bailey v. Henslee, 287 F.2d 936 (8th Cir. 1961), cert. denied 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961), Judge Blackmun discussed in detail the general principles to be followed in determining the existence of racial discrimination in the selection of a jury and enumerated nine factors[35] which, taken in the aggregate, established a prima facie case of racial discrimination in the selection of the jury. The Bailey case was noted by Chief Justice Harris in his opinion affirming petitioner's conviction, Trotter and Harris v. State, supra, 237 Ark. at 838, 377 S.W.2d at 25, and Chief Justice Harris fully discussed the facts now urged by petitioner.[36] Id. at 831–838, 377 S.W.2d at 21–25. Even the nine factors in the Bailey case, as pointed out by Chief Justice Harris, presented a "close" case in Judge Blackmun's view, and this Court now agrees that the evidence fails to establish that racial discrimination was practiced in the selection of the jury.

Petitioners have offered no additional evidence of jury discrimination not already considered by the Arkansas Supreme Court. In fact, the only evidence offered at the hearing held by this Court even relating to the selection of the jury was the testimony of Mr. Grubbs, one of the jury commissioners who selected the jury panel called for service at petitioners' trial and who testified at the state court hearing on the motion for a new trial. This witness was called by respondent at the instant hearing and outlined the method used by the jury commissioners to select the panel. He stated that only after the prospective jurors were approved by each jury commissioner was the poll tax book and the previous jury list consulted to confirm the necessary qualifications, i. e., as to whether or not the prospective juror was a qualified elector, Ark.Stat.Ann. § 3–101 (Repl. 1962), and as to whether or not the prospective juror had served on the jury within the past two years, Ark.Stat. Ann. § 39–225 (Supp. 1963). This testimony essentially was the same as that

---

31. Id. at 315–317.

32. Id. at 318.

33. Id. at 318 and 319.

34. Id. at 311.

35. 287 F.2d at 946 and 947.

36. Admittedly, Chief Justice Harris commented that, "It is interesting to note that it is conceded that Negroes have been *systematically included* * * *." Trotter and Harris v. State, supra at 837, 377 S.W.2d at 25. However, this was never "conceded" by the State and Chief Justice Harris merely quoted from the appellant's brief, page 60, in reply to appellant's argument that it was virtually impossible to have a Negro serving as a juror for the trial without the approval of the State because the State had ten peremptory challenges and, in the past, there had rarely been more than ten Negroes on the entire panel. This argument ignored the fact that at the state court trial the only Negroes on the panel excused on peremptory challenges were the three excused by petitioners, each of whom had been accepted by the State. See Note 27, infra. This argument is without merit and has recently been rejected in Swain v. State of Alabama, 85 S.Ct. 824 (1965). However constitutionally obnoxious and offensive the words "systematic inclusion" in the context of jury selection, this Court has made its own independent determination as to the manner in which the jury was selected, consistent with Bailey v. Henslee, 287 F.2d 936 (8th Cir. 1961), and without regard to the quotation for appellant's brief filed in state court.

considered on appeal by the Arkansas Supreme Court.[37]

■■■ Judge Blackmun quoted in Bailey the language of the United States Supreme Court in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), that "former errors cannot invalidate future trials." Judge Blackmun pointed out that, "[d]iscriminatory selection in prior years does not nullify a present conviction if the selection of the jury for current term is on a proper basis." Bailey v. Henslee, supra, 287 F.2d at 943. However strongly petitioners argue that racial discrimination existed for the past twenty consecutive terms of court, the question is: Was the selection of the jury for the current term which served for the trial of petitioners' case selected on a proper basis, i. e., "without regard to race and color" as discussed by Mr. Justice Reed in Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950)?

■■■ This Court has thoroughly examined the state court record and has heard the testimony of the jury commissioner, Mr. Grubbs, in accordance with the duty announced in Bailey of a federal court to make an independent determination as to whether a federal right has been denied in the particular now urged. This Court finds that the panel which was selected for the term of court when petitioners were tried and which served for the trial of their case was properly selected "without regard to race and color."

While racial identifications were available to jury commissioners, the evidence overwhelmingly establishes that the jury commissioners did not use the racial identification in selecting the panel. The isolated remark brought out on cross examination implying that Negroes on a panel made the panel "equal" is both ambiguous and misleading. Petitioners make no mention that there were actually eight Negroes called for jury service at the trial of their case and that petitioners exercised peremptory challenges against three of them, all of whom were accepted by the State. Whatever significance is to be attached to the isolated remark of the jury commissioner, the evidence falls far short of establishing that racial discrimination was practiced in the selection of the jury panel, as petitioners contend. This Court is convinced that petitioners' federal right to a jury selected without regard to race was fully preserved at their trial and their argument to the contrary is without merit.

### III. ADMISSIONS BY HARRIS

Petitioners finally contend that their constitutional rights were violated by the procedure employed by the trial court which petitioners allege did not afford them a reliable determination of the voluntariness of the alleged admissions by Harris and did not protect their federal right against a conviction based upon a coerced confession or admission within the recent holding on June 15, 1964, of the United States Supreme Court in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), discussed and distinguished by this Court in Mitchell v. Stephens, supra, 232 F.Supp. at 501 and 502.

In Jackson v. Denno, supra, Jackson filed a petition for habeas corpus asserting that his conviction for murder in the New York state court was invalid because based upon a confession not properly determined to be voluntary. At the state court trial of Jackson, his statements made to the police admitting the murder and robbery of a hotel clerk were introduced in evidence before the jury. No request was made for a hearing to determine the admissibility of the statements, and Jackson's counsel did not specifically object to the admission of the statements. However, the trial judge indicated its awareness that Jackson's counsel was questioning the circumstances under which Jackson was interrogated. Consistent with the New York practice, where a question has been raised about the voluntariness of a confession, the trial court submitted that issue to the

37. State Court Record, pp. 291(265)–293(267).

jury along with the other issues in the case. The jury was told that if it found the confession involuntary, it was to disregard it entirely, and determine guilt or innocence solely from the other evidence in the case; alternatively, if it found the confession voluntary, it was to determine its truth or reliability and afford it weight accordingly. Jackson was found guilty and sentenced to death. On appeal, the case was affirmed, People v. Jackson, 10 N.Y.2d 816, 178 N.E.2d 234 (1961), cert. denied 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961). Jackson's subsequent petition for habeas corpus was denied. Application of Jackson, 206 F.Supp. 759 (S.D.N.Y.1962), aff'd sub nom., United States ex rel. Jackson v. Denno, 309 F.2d 573 (2d Cir. 1962). On appeal from denial of the petition for habeas corpus, the United States Supreme Court held that under the Due Process Clause of the Fourteenth Amendment an accused questioning the voluntariness of a confession is entitled to an independent determination of this issue outside the presence of the trial jury.[38] Accordingly, the Supreme Court ruled unconstitutional the New York procedure whereby the trial judge heard evidence on the question of voluntariness of a confession and excluded it if in no circumstances could the confession be deemed voluntary, but left the ultimate determination of its voluntary character to the jury, un-der proper instructions, if certain facts bearing on the issue were in dispute or reasonable men could differ over the inference to be drawn from undisputed facts.[39] Jackson v. Denno, supra, 378 U.S. at 377, 84 S.Ct. at 1781, overruling Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), 378 U.S. at 391, 84 S.Ct. at 1788.

In Jackson v. Denno, supra, Mr. Justice Black noted in the appendix to his concurring opinion that Arkansas, as well as fourteen other states, the District of Columbia and Puerto Rico, has followed the so-called "New York" rule which the majority opinion in Denno declared unconstitutional. Id. at 414, 84 S.Ct. at 1801, Appendix A, Opinion by Justice Black, citing Monts v. State, 233 Ark. 816, 349 S.W.2d 350 (1961), Burton v. State, 204 Ark. 548, 163 S.W.2d 160 (1943), McClellan v. State, 203 Ark. 386, 156 S.W.2d 800 (1941).

 It should be pointed out that Jackson v. Denno, supra, was decided almost three months after the Arkansas Supreme Court's decision affirming petitioners' convictions and almost six months before the writ of certiorari to the United States Supreme Court was denied. There has been no argument made here as to whether the Denno decision should be applied retroactively, which some courts have permitted.[40] Re-

38. Mr. Justice White emphasized that " * * * the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.' (citation omitted) and because of the 'deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' (citation omit-

ted)." Jackson v. Denno, 378 U.S. 368, 385 and 386, 84 S.Ct. 1774, 1785 (1964).

39. Mr. Justice White noted that "[u]nder the New York rule the judge is not required to exclude the jury while he hears evidence as to voluntariness and perhaps is not allowed to do so." (citations omitted) Jackson v. Denno, 378 U.S. 368, 377, 84 S.Ct. 1774, 1781, note 7 (1964). See also Malloy v. Hogan, 378 U.S. 1, 6-8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

40. See, e. g., Com. ex rel. Butler v. Rundle, 416 Pa. 321, 206 A.2d 283 (Jan. 1, 1965); United States ex rel. Milford v. McMann, 231 F.Supp. 731, 733 (N.D. N.Y.1964); United States ex rel. Petersen v. McMann, 234 F.Supp. 287 (N.D. N.Y.1964); Rudolph v. Holman, 236 F.

spondent has argued only that the procedure employed in petitioners' trial was not violative of their federal rights as urged, and in the alternative, that this Court should make a determination as to the voluntariness of the admissions. This Court is aware of the conflict of authority on the issue of the retroactive application of Supreme Court decisions invalidating state criminal procedures.[41] However, the question as to the retroactivity of the Denno holding is not before the Court and a decision of this question is unnecessary. Denno is controlling here because petitioners' case was in the "ordinary appellate process" at the time Denno was decided. See, e. g., this distinction made on the application of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in United States ex rel. West v. LaVallee, 335 F.2d 230 (2d Cir. 1964) and United States ex rel. Carafas v. LaVallee, 334 F.2d 331 (2d Cir. 1964).

At Harris and Trotter's trial in state court, testimony by the Sheriff and Captain Griffin was given to the jury as to an admission made to them by Harris in his apartment during his arrest.[42] The victim's escort and City Policeman Newton testified to another admission made by Harris to them at the City Jail later that morning.[43] These two statements by Harris unmistakably identified petitioners as the two Negroes who committed the rape in question. As in Denno, defendants did not request that a hearing be held to determine the voluntariness of these statements and a specific ruling on this question was not made at any time by the trial judge. However, as in Denno, objections were made by defense counsel,[44] questioning the circumstances under which the statements were made, and noted by the trial court.[45] The trial judge later instructed the jury

---

Supp. 62, 68 and 69 (N.D.Ala.1964). See also Smith v. State of Texas, 236 F.Supp. 857 (S.D.Tex.1964), distinguishing Jackson v. Denno, supra note 39.

41. The most notable recent examples are Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684 (1961). For Mr. Justice Harlan's dissent to the Supreme Court's per curiam opinion vacating the ten pre-Gideon convictions, see Pickelsimer v. Wainwright, 375 U.S. 2, 84 S.Ct. 80, 11 L.Ed.2d 41 (1963). For cases giving retroactive effect to the Mapp decision, see the following: California v. Hurst, 325 F.2d 891 (9th Cir. 1963), petition for cert. filed 32 U.S.L.Week 3323 (U.S. March 13, 1964), Hall v. Warden, 313 F.2d 483 (4th Cir. 1963) cert. denied 374 U.S. 809, 83 S.Ct. 1693; 10 L.Ed.2d 1032 (1963); contra, United States ex rel. Linkletter v. Walker, 323 F.2d 11 (5th Cir. 1964), cert. granted 377 U.S. 930, 84 S.Ct. 1340, 12 L.Ed.2d 295 (1964). Gaitan v. United States, 317 F. F.2d 494 (10th Cir. 1962). United States ex rel. Angelet v. Fay, 333 F.2d 12 (2d Cir. June 11, 1964). Linkletter and Walker were set for oral argument before the United States Supreme Court

on March 1, 1965, 379 U.S. 955, 85 S. Ct. 639, (Feb. 16, 1965).

42. For the testimony of the Sheriff, see State Court Record, pp. 118(92) and 119(93), as well as 128(102); for the testimony of Griffin, see id. at 177(151) and 178(152).

43. For the testimony of the victim's escort, see id. at 72(46) and 73(47); for the testimony of Newton, see id. at 180 (154).

44. For the objections by defense counsel to statements made by either of the accused, see id. at 131(105); as to statements made by Harris in the jail, see id. at 74(48); as to any statement which Trotter might have made, see id. at 110 (84).

45. The trial court noted objection by petitioners' counsel to any statement which Trotter may have made. Id. at 174(146). The record does not contain any testimony as to any statement made by Trotter, only the two allegedly made by Harris which were heard by the jury. The trial judge cautioned the jury that statements by Harris were not to be considered as evidence against Trotter. Id. at 72(46), 73(47), 116(90), 118(92) and 177(151).

at the close of the case as to the effect to be given this testimony.[46]

It clearly appears that the issue of the voluntariness of the two statements allegedly made by Harris was raised at petitioners' trial in state court. Although the trial judge properly considered the question in accordance with settled state procedure,[47] such procedure violated petitioner Harris' constitutional rights under the holding of Jackson v. Denno, supra. Specifically, Harris was deprived of his federal right under the Due Process Clause of the Fourteenth Amendment to have an independent determination made by the court on the issue of the voluntariness of the alleged admissions prior to such testimony being heard by the trial jury. Under Denno, when an accused questions the voluntariness of a confession the trial judge must, *outside the presence of the jury*, independently determine this question. If the confession is found to be involuntary, it must be excluded altogether. Such determination can be made by the trial judge solely and finally;[48] or by the trial judge first outside the presence of the jury and then, if the judge determines it to be voluntary, he may re-submit the question of voluntariness to the jury.[49]

In short, the Arkansas procedure does not meet the constitutional requirements of due process as discussed in Denno. The Arkansas procedure, like the New York procedure, does not give "[a] defendant objecting to the admission of a confession * * * a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." Id., 378 U.S. at 380, 84 S.Ct. at 1783.

The primary constitutional pitfall of the Arkansas procedure, which a Denno hearing seeks to correct, is the possible prejudice to a defendant from the jury's consideration of a coerced confession when the evidence without the confession is insufficient to sustain a conviction. Id. at 382, 84 S.Ct. at 1783. Such a

46. Instruction No. 16, State Court Record, p. 216(190), as follows: "You are instructed that the State has offered some testimony regarding what are alleged to have been voluntary statements against the interest of each of the defendants made by him while in custody. Any such alleged admissions against his interest are presumed to be involuntarily made by each defendant, and the burden is on the State to prove to your minds by a preponderance of the evidence that such statements were freely and voluntarily made before you can consider them at all. If the State fails in this, you will not consider such alleged admission against his interests in arriving at your verdict. In addition to this, you are charged by the Court that before you can consider any such statements as evidence you must find: that each of the defendants did make such statements as alleged; that the alleged statements made are the ones you heard from the witness stand; and that such statements were voluntarily made by each of the defendants. If any of these elements is not shown by the evidence you will give no consideration to such alleged statements.

"You are further instructed that any purported admission or statement by one defendant cannot and will not be considered by you as evidence against the other defendant unless made in the presence of the other defendant."

47. For a full discussion of the admission of confessions under Arkansas procedure, see Barnhart, The Determination of Facts Preliminary to Admission of Evidence in the Arkansas Courts, 2 Ark.L. Rev. 1, 8–14 (1947). Admittedly, some Arkansas cases have apparently approved the so-called "orthodox" rule. See, e. g., Runnels v. State, 28 Ark. 121 (1873). Corley v. State, 50 Ark. 305, 7 S.W. 255 (1887). Smith v. State, 74 Ark. 397, 85 S.W. 1123 (1905). Nelson v. State, 190 Ark. 1078, 83 S.W.2d 539 (1935).

48. This is the so-called "orthodox" rule, as discussed in Jackson v. Denno, supra note 28 at 378, 84 S.Ct. at 1781, with jurisdictions listed in Appendix A, Opinion of Black, J., 411–414, 84 S.Ct. 1799–1801.

49. This is the so-called "Massachusetts" rule, as discussed in Jackson v. Denno, supra note 38 at 378, note 8, 84 S.Ct. at 1781, with jurisdictions following this rule listed in Appendix A, Opinion of Black, J., 417–420, 84 S.Ct. 1802–1804.

hearing avoids the danger that matters pertaining to the defendant's guilt will infect the jury's findings of fact bearing upon voluntariness of the confession, as well as a conclusion upon that issue itself. Id. at 383, 84 S.Ct. at 1784. As stated by Mr. Justice White in Jackson v. Denno, supra:

"Under the New York procedure, the evidence given the jury inevitably injects irrelevant and impermissible considerations of truthfulness of the confession into the .assessment of voluntariness. Indeed the jury is told to determine the truthfulness of the confession in assessing its probative value. As a consequence, it cannot be assumed * * * that the jury reliably found the facts against the accused. * * The admixture of reliability and voluntariness in the considerations of the jury would itself entitle a defendant to further proceedings in any case in which the essential facts are disputed, for we cannot determine how the jury resolved these issues and will not assume that they were reliably and properly resolved against the accused. * * * " Id. at 386 and 387, 84 S.Ct. at 1786.

* * * * * *

"It is difficult, if not impossible, to prove that a confession which a jury has found to be involuntary has nevertheless influenced the verdict or that its findings of voluntariness, if this is the course it took, [were] affected by other evidence showing the confession was true. But the New York procedure poses substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined. * * * " Id. at 389, 84 S.Ct. at 1787.

■■ It should be emphasized that it was only Harris who was deprived of a constitutional right under the procedure used at the state court trial, and not Trotter. Indeed, the jury was instructed on five separate occasions during the course of the trial not to consider any statement made by Harris as evidence against Trotter unless made in the latter's presence.[50] It follows that since Harris was not given a hearing and a determination of the voluntariness of his admissions by the trial judge he is now entitled to a full evidentiary hearing to determine the factual context in which the admissions were made. This Court should not make that determination. Jackson v. Denno, supra at 392, 84 S.Ct., at 1789. Under Denno, it is the state court which is entitled initially to make this determination. Id. at 393, 84 S.Ct. at 1789.

■■ If the state trial court, at an evidentiary hearing, determines that the admissions were voluntarily made, then there is no constitutional necessity of a new trial for Harris and the jury verdict against him may stand; on the other hand, a determination that the admissions were involuntary requires that Harris be given a new trial to determine his guilt or innocence without testimony of the admissions being admitted into evidence. Id. at 394, 84 S.Ct. at 1790. Of course, the State is free to give Harris a new trial if it so chooses before the outcome of the evidentiary hearing on the voluntariness of the admissions, but there is no constitutional requirement to this effect. Id. at 395, 84 S.Ct. at 1790.

■■ It should be pointed out that as to cases tried after the decision of the United States Supreme Court in Jackson v. Denno, supra, i. e., June 15, 1964, a proper determination of voluntariness should be made prior to the admission of the confession to the jury when the issue of voluntariness of the confession has been raised. A post-Denno trial without such a determination may require, upon review, that the accused be given a new trial instead of

---

50. See Note 33, supra. There is no reason to believe that these instructions were not followed, regardless of whether the jury concluded that Harris' admissions were voluntary or coerced.

merely a hearing on the issue of voluntariness. Id. at 395, 84 S.Ct. at 1790. But as to Harris, who has already been convicted and who now seeks collateral relief, it cannot be said that there is federal requirement under the Constitution of a new trial " * * * if in a soundly conducted collateral proceeding, the confession which was admitted at the trial is fairly determined to be voluntary. Id. at 395 and 396, 84 S.Ct. at 1791.

The State is given seven months from the date this opinion is filed with the Clerk of this Court to either allow the trial court to conduct a hearing on the issue of voluntariness of Harris' confession or to retry him. If, for good cause shown, it becomes impossible or inappropriate to try him within that period of time, application may be made to this Court by either Harris or the State for a reasonable extension of time.

If Harris is given a hearing to determine the issue of voluntariness or if he is retried, the Court will enter dismissal of Harris' present petition of habeas corpus. If Harris is not given such a hearing, or, if the State elects, a new trial, within the period prescribed in this opinion, or within such other period of time as may be set by an appellate court, Harris' petition for habeas corpus will be granted. As to Trotter, his petition will be dismissed.